UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

M.H. and S.R., individually, and on behalf of
H.H., a minor,

                              Plaintiffs,

              -against-                                    10 Civ. 1042 (RJH)

                                                          **MEMORANDUM OPINION
THE NEW YORK CITY DEPARTMENT OF                            AND ORDER**
EDUCATION,

                              Defendant.

Richard J. Holwell, District Judge:

         Plaintiffs commenced this action on February 9, 2010, appealing from a determination

from a State Review Officer ("SRO") that defendant New York City Department of Education

("DOE") had offered a free and appropriate public education ("FAPE") and that therefore

plaintiffs were not entitled to reimbursement of tuition for the private school in which H.H. was

enrolled.  Now before the Court are plaintiffs' and defendant's motions for summary judgment

pursuant to Federal Rule of Civil Procedure 56.  For the reasons that follow, defendant's motion

for summary judgment is GRANTED, and plaintiffs' is DENIED.

## BACKGROUND

### I.  H.H.'s Educational Background Prior To Requesting a FAPE

         H.H. is a 17-year-old high-school student who was enrolled at the Robert Louis

Stevenson School ("RLS") at the time this action was filed.  Her parents, M.H. and S.R. (the

"Parents"), filed this action seeking reimbursement of H.H.'s tuition at RLS, in which H.H.

enrolled after anxiety and emotional issues prompted her withdrawal from her previous school, Columbia Grammar and Prep ("Columbia").

H.H. attended Columbia, a private school, from kindergarten until January 2009, when she was in the tenth grade. (Parents Ex. F at 2.) H.H.'s history at Columbia had always been one of good grades, and especially from fifth until the middle of eighth grade, H.H. functioned well at home and in school. (*See id.* at 3.) In her last couple of years at Columbia, however, H.H. encountered more difficulty coping with school.   When H.H. was in the eighth or ninth grade, she unexpectedly told her mother that although she knew she had a test that day, that she was not going to go to school. (*See* Parents Ex. F at 3; Transcript of Impartial Hearing ("Tr.") at 143.[1]) Because this incident was unusual, H.H.'s mother allowed her to stay home that day, but required her to take the test the next day. (Parents Ex. F at 3; Tr. at 143.)

H.H. was sick "several times" "off and on" during the 2007-08 school year, when she was in ninth grade, but had one especially bad episode of stomach flu about halfway through the year that resulted in her missing school for three weeks. (Tr. at 143; *see* Parents Ex. F at 3.) Although H.H. could have returned to school after two weeks, she stayed out an extra week because "the anxiety for catching up [in school] was tremendous." (Tr. at 143; *see* Parents Ex. F at 3.) For the rest of that school year, although H.H. was able to make up the work that she had missed and still received good grades, she showed several signs of stress during that time. For example, H.H. would cry often, both in school and at home. (Parents Ex. F at 4.) H.H. would also, on occasion, scratch herself until her skin was raw. (*Id.*) In addition, although H.H. did make up her work, she refused to take two of her final exams at the end of the ninth-grade year.

---

[1] The social history (Parents Ex. F) indicates that this incident happened in the middle of eighth grade, but H.H.'s mother testified later that it happened during H.H.'s ninth-grade year.

(Tr. at 147; Parents Ex. F at 4.)   Columbia, at that point, gave H.H. two incompletes and told her to take the finals after the summer.  (Tr. at 147; Parents Ex. F at 4.)

H.H. had a "no stress summer," after which she returned to Columbia in the fall of 2008 in good spirits.  (Tr. at 147; Parents Ex. F at 4.)  Columbia granted H.H.'s request not to take the two finals she had missed so that she could "start fresh this year and not think about bad memories."  (Parents Ex. F at 4.)  H.H.'s happy return to school, however, was short-lived.  Two or three weeks into the school year, H.H. became overwhelmed by school again, "felt like she was going to the park and crying in between classes," and cried every night at home.  (Tr. at 145, 147; Parents Ex. F at 4.)   On two occasions, H.H. stood in front of Columbia for two hours with her mother and refused to enter, saying she was afraid that she would lose control and embarrass herself in front of others.  (Parents Ex. F at 5.)  In November 2008, H.H. stopped going to school altogether.  (Tr. at 147.)  Columbia then decided to put H.H. on a medical leave of absence until January 2009, after which H.H. would be eligible to return.  (Tr. at 148.)  H.H. did not return to Columbia.

## II. Psychiatric Evaluations and Entering RLS

During H.H.'s last few weeks at Columbia, her parents took her to Dr. Elizabeth Auricchio, a clinical psychologist and assistant clinical professor of medical psychology at Columbia University, for a psychoeducational evaluation.  Dr. Auricchio evaluated H.H. on September 30 and October 1, 2008, conducting a number of tests.  (Parents Ex. K at 1-3.)  Dr. Auricchio's evaluation characterized H.H. as "a young lady with intellectual potential in the superior range."  (*Id.* at 8.)  But Dr. Auricchio also diagnosed H.H. with "a Learning Disorder Not Otherwise Specified."  (*Id.*)  Specifically, Dr. Auricchio noted that although H.H.'s "reading comprehension is good, [her] word attack skills are poor."  (*Id.*)  The evaluation also remarked

that H.H. "exhibits an Anxiety Disorder Not Otherwise Specified." (*Id.*)  Specifically, the

evaluation mentioned that H.H. experienced "intense" anxieties on a daily basis "when she feels

overwhelmed with the academic tasks facing her" and that these feelings are "intensified when

she is faced with being 'judged' in a testing situation." (*Id.*)  Dr. Auricchio's evaluation made

several suggestions.  First, it suggested extended time for lengthy classroom and standardized

tests to allay H.H.'s anxieties.  (*Id.* at 9.)  Second, it suggested that H.H. work with a learning

disabilities specialist in preparing for lengthy tests to give her coping strategies.  (*Id.*)  Third, it

suggested that H.H. do her writing on a computer so that she could check spelling and

punctuation; and finally, it suggested that H.H. continue in a "psychotherapeutic relationship in

order to better understand and learn to deal with her anxiety and depression." (*Id.*)

On December 10, 2008, H.H. was evaluated by Dr. Aleta Angelosante, a clinical

psychologist with the Child Study Center at New York University ("NYU").  (Parents Ex. P.)

Dr. Angelosante found that H.H. met diagnostic criteria for "Major Depressive Disorder, Single

Episode, Moderate," for "Generalized Anxiety Disorder," and was "beginning to display traits

associated with Cluster B personality disorders." (*Id.* at 5-6.)  Dr. Angelosante recommended

weekly individual dialectical behavior therapy ("DBT") sessions to address H.H.'s emotional

issues, a weekly DBT skills group, joint DBT sessions with the Parents to work on family issues,

and separate sessions with the Parents, if necessary, to discuss parenting strategies.  (*Id.* at 7.)

Dr. Angelosante also gave H.H. a Global Assessment of Functioning score of 50, which indicates

"between serious and moderate symptoms of dysfunction." (*Id.* at 6; *see* Tr. at 120.)

Also in December of 2008, H.H. began seeing Dr. Nami Stilman, a Board Certified Child

and Adolescent and Adult Psychiatrist and Internist, as her private psychiatrist.  (Tr. at 115-16.)

Dr. Stilman referred H.H. to a day treatment program at Four Winds Hospital ("Four Winds")

because H.H. "was basically completely non-functional at home."  (Tr. at 116-17.)  H.H. was admitted to Four Winds on February 5, 2009, where she was diagnosed with Bipolar II Disorder. (Parents Ex. M at 5.)  Four Winds discharged H.H. on February 26, 2009, and her discharge plan included attendance at RLS, psychotherapy follow-up with Dr. Stilman, and DBT sessions twice a week at NYU.  (Parents Ex. M at 9.)  Dr. Stilman recommended that H.H. enroll at RLS upon discharge from Four Winds because "she was still fragile emotionally" and "if she were in the correct . . . nurturing and therapeutic and consistent environment, such as [RLS], that they might be able to keep her in school."  (Tr. at 119.)  H.H.'s mother signed a registration contract with RLS the day of H.H.'s discharge.  (Parents Ex. I.)

### III. Development of the Individualized Education Plan

By letter dated February 27, 2009, H.H.'s mother requested that the Committee on Special Education ("CSE") provide a FAPE for H.H.  (Parents Ex. S.)  The DOE then sent an Appointment Letter and Initial Notice of Referral, both dated March 18, 2009, indicating that the CSE had received a referral from H.H.'s mother and that the CSE needed to evaluate H.H. to asser her educational needs.  (Parents Ex. H.)  The DOE also sent a Consent for Initial Evaluation form dated March 18, 2009, which H.H.'s mother returned with a signature dated April 3, 2009.  (DOE Ex. 2.)

On May 29, 2009, the CSE convened to formulate an Individualized Education Plan ("IEP") for H.H.  (Parents Ex. C.)  Present at the CSE conference were the Parents; Patricia Carrico, a school psychologist acting as the district representative; a general education teacher; a special education teacher; a parent member of the CSE; the parents' advocate from Susan Luger Associates; and Bud Henrichsen, the director of RLS.  (*Id.* at 2.)  The CSE reviewed the evaluations of Drs. Auricchio and Angelosante, a social history interview with H.H.'s mother, a

vocational interview with H.H. and her mother, a classroom observation of H.H. at RLS, teacher

reports from Columbia and RLS, and Henrichsen's "detailed" description of H.H.  (Tr. at 13-15,

32.)

The IEP classified H.H. as "Other Health Impaired."  (Parents Ex. C at 1.)  It

recommended a plan of "general education with related services only."  (*Id.*)  Although the IEP

itself did not specify what the "related services" would be, meeting minutes from the CSE

conference indicate that the services were to be one-on-one counseling twice a week for forty

minutes per session.  (DOE Ex. 4 at 1.)  The IEP characterized H.H.'s cognitive and academic

achievement as average to high average, and therefore did not find that H.H. had any academic

management needs.  (*Id.* at 3, 7.)  Instead, the IEP found that her "high average verbal and

perceptual abilities are best served in a general eduation classroom with the support of

counseling."  (*Id.* at 8.)  It did, however, identify H.H.'s social/emotional management needs as

"help [H.H.] guard against her unrealistic perfectionism; emphasize her need to appreciate her

very real cognitive and emotional giftedness."  (*Id.* at 4.)  In identifying these needs, the IEP

noted that H.H. was "emerging from a long period of school withdrawal, depression and anxiety

over her performance vis-a-vis her peers."  (*Id.*)  The IEP further noted that H.H. feels "judged"

easily, which makes her "withdraw from a challenge."  (*Id.*)  To ensure that these needs were

being met, the IEP identified four annual goals to be evaluated by H.H.'s counselor and teacher:

(1) learn to be more realistic and less perfectionistic with respect to her social interactions; (2) do

the same with respect to academic tasks; (3) develop strategies to help her cope with social

interactions; and (4) develop organizational strategies that allow her to manage her obligations

without falling into perfectionism.  (*Id.* at 6.)  Finally, the IEP gave H.H. extended time and a

separate location with fewer than twelve students for tests.  (*Id.* at 9.)

By letter dated June 5, 2009, the DOE informed H.H.'s parents that H.H.'s placement would be at the James Baldwin School ("Baldwin").  (Parents Ex. Q.)  The Parents wrote back to the DOE on June 24, 2009, to inform it that they would be keeping H.H. in RLS, noting that "it seem[ed] to be working" for H.H., that "changing schools and adding the stress of readjustment . . . simply does not make sense," and that they felt Baldwin could not "adequately serve [H.H.'s] needs for eleventh grade."  (Parents Ex. O.)  The letter indicated that instead of accepting the IEP, the Parents would be seeking tuition reimbursement.  (*Id.*)

## IV. The Impartial Hearing Officer's Decision

The Parents requested an impartial hearing by counsel's letter dated July 20, 2009. (Parents Ex. A.)  The letter recounted the various psychiatric and psychoeducational evaluations that H.H. had received.  (*Id.* at 2.)  In addition, the letter also alleged several reasons why the CSE's actions regarding H.H. were improper, including: (1) the IEP was inappropriate because it did not reflect all of H.H.'s educational, social, and emotional needs in its goals and objectives, recommended a general education program with related services only, and mandated an inappropriate level of related services; (2) the IEP's program recommended an inappropriate classroom size, student-to-teacher ratio, school building size, teaching methodology, program length, and non-therapeutic environment; (3) the CSE meeting failed to offer a placement in a timely manner; (4) the CSE team was not duly constituted because no social worker was present; (5) the CSE failed to consider the recommendations of the private evaluations and did not conduct their own testing; (6) the CSE had predetermined H.H.'s program; (7) the Parents were not given a copy of the IEP at the CSE meeting; (8) the Parents were denied meaningful participation at the meeting; and (9) no CSE meeting was held for the 2008-09 school year,

denying H.H. a FAPE for that year.  (*See id.* at 2-3.)  An impartial hearing was held on August 31, 2009.

On October 14, 2009, the Impartial Hearing Officer ("IHO") issued an eight-page Amended Findings of Fact and Decision (the "IHO Decision") in favor of plaintiffs.[2]  The IHO found that the Baldwin placement failed to provide a FAPE because of "its large class size and minimal availability of related services to meet [H.H.'s] requirements."  (IHO Decision at 7.)  In so finding, the IHO remarked that he found the testimony of plaintiffs' witnesses "most compelling," and that because of her "genetic make-up, her adjustment disorder, her refusal to attend school, and her poor self-image," H.H. was "at a critical crossroad."  (*Id.*)  The IHO further found that RLS constituted an appropriate placement, based on "a pamphlet describing the philosophy and function of [RLS]" and "the testimony of its Headmaster."  (*Id.*)  Finally, the IHO found that there was "no evidence to suggest that the Parents have been anything but cooperative in their relationship with the District" and that the equities therefore favored reimbursement.  (*See id.*)  Therefore, the IHO found that the DOE failed to provide a FAPE for the last quarter of the 2008-09 school year and for the 2009-10 school year.  (*Id.* at 8.)  Accordingly, the IHO ordered the DOE to reimburse the Parents for tuition from March through June of 2009 and the 2009-10 school year at RLS.  (*Id.*)  The IHO further ordered the DOE to provide counseling services and to reimburse the Parents for psychoeducational testing costs. (*Id.*)

### V.  The SRO's Decision

The DOE appealed from the IHO Decision to the SRO by petition dated November 6, 2009.  The DOE asserted that the IHO Decision erred by holding (1) that the DOE denied H.H. a

---

[2] The October 14, 2009 IHO Decision appears to be identical to the original October 2, 2009 version, except that the Amended Decision adds a specific dollar amount for testing costs that DOE was ordered to reimburse.  (*Compare* IHO Decision to IHO Findings of Fact and Decision dated October 2, 2009.)

FAPE; (2) that RLS was an appropriate placement; (3) that the Parents cooperated with the CSE; and (4) that the Parents could seek direct payment to RLS.  (*See generally* DOE Memorandum of Law in Support of the Verified Petition.)

In a thorough, nineteen-page decision, the SRO sustained the DOE's appeal and annulled the portions of the IHO Decision ordering the DOE to reimburse the Parents for tuition at RLS. (SRO Decision at 19.)  Initially, the SRO found that the IHO erred by awarding the Parents partial tuition reimbursement for the 2008-09 school year.  (SRO Decision at 15.)  The SRO reasoned that because state regulations require a district to complete the individual evaluation of a student within sixty calendar days from the date of receipt of parental consent to evaluate the student, and parental consent was provided on April 3, 2009, the CSE's May 29, 2009 meeting was timely.  (SRO Decision at 14.)  The SRO further reasoned that "the 2008-09 school year ended before the [DOE] was required to arrange for the provision of appropriate special education and services pursuant to State regulations."  (*Id.* at 15.)  Therefore, the SRO found that it was inappropriate to award any tuition reimbursement for the 2008-09 school year.  (*Id.*)

The SRO further found that "the hearing record reveals that the district developed an appropriate program for the student at the May 2009 CSE meeting that would have been appropriately implemented by the recommended placement."  (*Id.*)  According to the SRO, the IEP "accurately reflected the student's needs, included appropriate annual goals to address those needs, and provided the student with appropriate related services in the [least restrictive environment]."  (*Id.*)  In finding that the IEP accurately reflected H.H.'s needs, the SRO emphasized the sources that the CSE had considered in its formulation of the IEP.  First, with respect to the IEP's description of H.H.'s level of academic performance, the SRO noted that the CSE considered information from Dr. Auricchio's evaluation of H.H., teacher reports from RLS,

Henrichsen's "very detailed description" of H.H., a classroom observation of H.H., and a social history in developing that description. (*Id.*) Second, with respect to H.H.'s social and emotional functioning, the SRO noted that the CSE considered input from the Parents, RLS, and reports of the student. (*Id.*) The SRO further remarked that the Parents and Henrichsen "participated when the student's present levels of performance were developed at the May 2009 CSE meeting" and that no one objected to the levels of performance then developed. (*Id.*)

The SRO Decision then examined each of H.H.'s needs and found that the IEP had developed a plan to address each one. The SRO found that the IEP's recommendation for extended time and a separate location with fewer than twelve students for H.H.'s tests addressed her test anxiety and slow visual processing. (*Id.* at 15-16.) H.H.'s social and emotional needs were addressed by the recommendation of two 40-minute individual counseling sessions per week. (*Id.* at 16.) The SRO further found that the annual counseling goals in the IEP specifically addressed Heinrichsen's input as to H.H.'s difficulties. (*Id.*) Based on the testimony of Baldwin's principal, the SRO found that Baldwin would have been able to implement the IEP and would have met H.H.'s individual educational needs. (*Id.*) In particular, the SRO credited Baldwin's "crew" advisory program, which he found "would have addressed the student's anxiety as well as her tendency to feel 'judged.'" (*Id.* at 16-17.)

The SRO decision also specifically addressed the contention that Baldwin was an inappropriate placement because of its class size. As an initial matter, the SRO found that the nature of the placement as one into a general education program did not render it inappropriate. (*Id.* at 18.) In so finding, the SRO noted that the "May 2009 CSE did not consider a day treatment or hospital program to be appropriate . . . because they determined that cognitively the student belonged in a general education classroom that would offer academic challenges, and

because the student's 'poor behavior,' . . . took place in the home." (*Id.*)  The SRO further noted

that nothing in Dr. Auricchio's evaluation "indicate[d] that the student needed a full time special

education or hospital placement" or that "the student required a classroom setting other than a

general education setting." (*Id.*)  Although "testimony by the student's private psychiatrist

indicated that the maximum class size the student could manage was 10 to 12 students," the SRO

discounted this testimony because "the psychiatrist also testified that she was not familiar with

the recommended school" and also because "neither the October 2008 private psychoeducational

evaluation report nor the December 2008 diagnostic psychiatric evaluation report . . . included in

their recommendations that the student required a limited class size." (*Id.* at 18-19.)  In addition,

according to the SRO, nothing in the hearing record "reflect[ed] that the student's needs included

difficulty functioning in larger groups or that her tendency to place unrealistic academic

expectations on herself was affected by class size." (*Id.* at 19.)

   Therefore, the SRO found that "the district met its burden to show that the May 2009 IEP

accurately reflected the student's needs and that the district's recommended program was

reasonably calculated to confer educational benefits on the student in the [least restrictive

environment." (*Id.*)  Because these issues were dispositive, the SRO did not consider whether

the Parents' placement at RLS was appropriate.  This action followed the SRO's decision, and

the Parents maintain that the May 2009 IEP did not offer a FAPE.

## DISCUSSION

### I.  Standard of Review

   Under the IDEA, district courts hearing an appeal from the SRO "(i) shall receive the

records of the administrative proceedings; (ii) shall hear additional evidence at the request of a

party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as

the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  The Supreme Court, however,

has cautioned that "the provision that a reviewing court base its decision on the 'preponderance

of the evidence' is by no means an invitation to the courts to substitute their own notions of

sound educational policy for those of the school authorities which they review."  *Board of*

*Education v. Rowley*, 458 U.S. 176, 206 (1982).  The Second Circuit has "frequently explained

that 'the role of the federal courts in reviewing state educational decisions under the IDEA is

circumscribed.'"  *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009)

(quoting *Gagliardo v. Arlington Central School District*, 489 F.3d 105, 112 (2d Cir. 2007)).

This is because "courts lack the 'specialized knowledge and experience' necessary to resolve

'persistent and difficult questions of educational policy.'"  *Rowley*, 458 U.S. at 208 (quoting *San*

*Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 42 (1973)).  Therefore, "courts must

be careful to avoid imposing their view of preferable educational methods upon the States" and

"due weight" is to be given to state administrative proceedings.  *Id.* at 206-07; *see also Cerra v.*

*Pawling Central School District*, 427 F.3d 186, 191 (2d Cir. 2005) ("[I]t is critical to recall that

IDEA's statutory scheme requires substantial deference to state administrative bodies on matters

of educational policy.").  "[D]eference to the administrative proceedings is particularly

warranted when the district court's decision is based solely on the administrative record."

*Gagliardo*, 489 F.3d at 113.  When, as here, "the SRO's decision conflicts with the earlier

decision of the IHO, the IHO's decision 'may be afforded diminished weight.'"  *A.C. ex rel.*

*M.C. v. Board of Education*, 553 F.3d 165, 171 (2d Cir. 2009) (quoting *Gagliardo*, 489 F.3d at

113 n.2).  In such situations, a district court should "'defer to the final decision of the state

authorities,' even where 'the reviewing authority disagrees with the hearing officer.'"  *Id.*

(quoting *Karl ex rel. Karl v. Board of Education*, 736 F.2d 873, 877 (2d Cir. 1984)).

"'Summary judgment appears to be the most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions,' but in this context, 'the inquiry . . . is not directed to discerning whether there are disputed issues of fact.'" *C.G. ex rel. B.G. v. New York City Dep't of Educ.*, --- F. Supp. 2d ---, 2010 WL 4449386, at *2 (S.D.N.Y. Oct. 25, 2010) (quoting *Jennifer D. ex rel. Travis P. v. New York City Dep't of Educ.*, 550 F. Supp. 2d 420, 429 n.10 (S.D.N.Y. 2008)). "[R]ather, it is a 'pragmatic procedural mechanism' for reviewing administrative decisions." *T.P. ex rel. S.P. v. Mamaroneck Union Free School District*, 554 F.3d 247, 252 (2d Cir. 2009) (quoting *Lillibask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)).

## II.  Tuition Reimbursement Under the IDEA

"In order to receive federal funding under the IDEA, a state must provide to all children with disabilities 'a free appropriate public education.'" *Gagliardo*, 489 F.3d at 111 (quoting 20 U.S.C. § 1412(a)(1)(A)).  "If parents believe that the state has failed their child in this regard, they may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." *Id.*

Courts "undertake a three-step process to determine whether parents are entitled to tuition reimbursement." *T.Y.*, 584 F.3d at 417.  First, a court "consider[s] whether the school district has complied with the IDEA's procedural requirements." *Id.*  Next, the court "ask[s] whether the IEP is reasonably calculated to enable the child to receive educational benefits." *Id.* (internal quotation marks omitted).  "If the answer to either of these questions is 'no,' [the court] then ask[s] whether the private schooling obtained by the parents is appropriate to the child's needs." *Id.* (internal quotation marks omitted).

Generally, "[t]he party who commences an impartial hearing—in this case, the parents—bears the burden of persuasion" on these inquiries.  *Gagliardo*, 489 F.3d at 112 (citing *Schaeffer v. Weast*, 546 U.S. 49, 57-58 (2005)); *see T.P.*, 554 F.3d at 252 ("As the party commencing the administrative review, the parents bear the burden of persuasion as to the inappropriateness of [the school district's] IEP and the appropriateness of the private services.").  The *Schaeffer* decision did not resolve whether a state law could shift that burden by statute, but New York amended N.Y. Educ. Law § 4404(1)(c) in 2007 to allocate the burden of persuasion and production to the school district in an impartial hearing, except as to the appropriateness of a unilateral placement, for which the parents bear the burden.[3]  Regardless of whether the state statute applies to this action, however, it is "clear" that the Court must defer to the SRO's decision in favor of the DOE, and therefore it is "incumbent upon the Parents to bring to the Court's attention any procedural or substantive flaws and explain why they allegedly warrant reversal." *W.T. and K.T. ex rel. J.T. v. Board of Educ.*, 716 F. Supp. 2d 270, 287 (S.D.N.Y. 2010).

## A.  Procedural Issues

"The initial procedural inquiry in an IDEA case 'is no mere formality,' as 'adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.'"  *A.C.*, 553 F.3d at 172 (internal quotation marks omitted) (quoting *Walczak v. Fla. Union Free School District*, 142 F.3d 119, 129 (2d Cir. 1998)).  "[A]lthough a material violation of the procedural requirements may result in the denial of a FAPE, it does not follow that every procedural violation will automatically

---

[3] The relevant text of N.Y. Educ. Law § 4404(1)(c) reads: "The board of education or trustees of the school district or the state agency responsible for providing education to students with disabilities shall have the burden of proof, including the burden of persuasion and burden of production, in any such impartial hearing, except that a parent or person in parental relation seeking tuition reimbursement for a unilateral parental placement shall have the burden of persuasion and burden of production on the appropriateness of such placement."

render the IEP legally inadequate under the IDEA." *W.T.*, 716 F. Supp. 2d at 287 (citing *A.C.*, 553 F.3d at 172).

The DOE argues that it complied with the IDEA's procedural requirements, noting that the CSE was properly constituted and provided a timely recommendation.  (DOE Mem. at 16-17.)  It is not disputed that the Parents, Carrico, a general education teacher, a special education teacher, an additional parent member of a student with a disability, the Parents' advocate, and RLS's director attended the meeting.  Under New York and federal law, this constitution of the CSE is sufficient, and plaintiffs do not appear to contest the makeup of the CSE.  *See* 8 N.Y.C.R.R. § 200.3(a)(1); 20 U.S.C. § 1414(d)(1)(B).

As for timeliness, plaintiffs argue that the May 29, 2009 CSE meeting was untimely because they requested a FAPE on February 27, 2009, and New York law requires the DOE to "arrange for appropriate special programs and services" within "60 school days of the receipt of consent to evaluate for a student not previously identified as having a disability."  8 N.Y.C.R.R. § 200.4(e)(1).  Because "the projected date of th[e] IEP was September 2009," plaintiffs assert that "the provision of services was six months after the requested evaluation," in violation of this provision.  (Pl.'s Reply at 1.)  The DOE responds that "a parents' request for referral for an initial evaluation," which happened on February 27, and "parental consent to evaluate are not the same thing."  (DOE Reply at 2.)  Therefore, according to the DOE, "the 60 days pursuant to 8 N.Y.C.R.R. §§ 200.4(d) and (e)(1) began to run on or about April 3, 2009, the date when the parent provided consent for an initial evaluation, and the May 29, 2009 IEP was timely."  (*Id.*)

The Court agrees with the DOE.  As the SRO found, H.H.'s mother provided the DOE with consent to evaluate H.H. on April 3, 2009.  (SRO Decision at 14; DOE Ex. 2.)  Although

plaintiffs urge the Court to consider the initial request for a FAPE as parental consent to evaluate

H.H., the Court declines to do so.  "Consent" is statutorily defined as meaning:

> (1) the parent has been fully informed, in his or her native language or other mode of communication, of all information relevant to the activity for which consent is sought, and has been notified of the records of the student which will be released and to whom they will be released;

> (2) the parent understands and agrees in writing to the activity for which consent is sought; and

> (3) the parent is made aware that the consent is voluntary on the part of the parent and may be revoked at any time except that, if a parent revokes consent, that revocation is not retroactive (*i.e.,* it does not negate an action that has occurred after the consent was given and before the consent was revoked).

8 N.Y.C.R.R. § 200.1(l).  None of these provisions can be said to have been satisfied by the

Parents' initial request for a FAPE, which stated *in toto*: "I am requesting the CSE provide a free

Appropriate Public education for my child [H.H.].  I believe my child requires special education

services."  (Parents Ex. S.)  *Anello v. Indian River School District*, Civ. No. 07-668-LPS, 2009

WL 304214 (D. Del. Feb. 6, 2009), cited by plaintiffs, is distinguishable.  There, a parental letter

triggered the timeline to commence an eligibility meeting, but "parental consent was implicit in

the parental request which was made on February 3, 2004."  *Id.* at *11.  This was because the

parental letter included a request that the child "receive 'further evaluations to rule out more

things.'"  *Id.*  No such language accompanied the analogous letter in this case, and therefore the

Parents' letter in this case did not function as consent to have H.H. evaluated.  April 3, 2009,

therefore, is the operative date.  For that reason, the Court also agrees with SRO and the DOE

that the expiration of the 60 school days following consent on April 3, 2009, happened after the

2008-09 school year had ended, and that therefore DOE was not required to provide a FAPE for the 2008-09 school year.[4]  (*See* SRO Decision at 14-15; DOE Mem. at 15.)

Plaintiffs also contend that the DOE's failure to conduct its own evaluation of H.H. denied her a FAPE.  (Pl.'s Reply at 7.)  The DOE, however, contends that "nothing in the IDEA or implementing regulations . . . requires the school district itself to conduct an evaluation so long as the district has adequate information before it to assess the Student's needs."  (DOE Reply at 5.)  The case law supports DOE's argument.  In *Hudson v. Wilson*, 828 F.2d 1059, 1065 (4th Cir. 1987), for example, the Fourth Circuit remarked that the IDEA "clearly permits parents to obtain private testing and nowhere implies that local schools must corroborate private results before using them."  In *Mackey v. Board of Educ.*, 373 F. Supp. 2d 292, 299 (S.D.N.Y. 2005), the court found that "the District's failure to perform an independent psychiatric evaluation was inconsequential where the parents had shared a private assessment and where the student had been the subject of a number of neurological and neuropsychological evaluations."  The court further held that the "IDEA does not compel a school district to perform every sort of test that would arguably be helpful before devising an IEP for a student."  *Id.*  Here, therefore, the CSE could permissibly rely on the evaluations of Drs. Auricchio and Angelosante instead of performing its own psychological evaluation.

Indeed, plaintiffs do not point to a provision of the IDEA that compels local school districts to conduct their own independent evaluations.  The sole case that plaintiffs do cite on this point, *N.B. v. Hellgate Elementary School District*, 541 F.3d 1202 (9th Cir. 2008), is consistent with DOE's argument.  There, the Ninth Circuit faulted the school district for failing

---

[4] A "school day" is defined as "any day, including a partial day, that students are in attendance at school for instructional purposes."  8 N.Y.C.R.R. § 200.1(n)(1).  A "school year " is "the period commencing on the first day of July in each year and ending on the thirtieth day of June next following."  N.Y. Educ. Law § 2(15).  Because the spring recess for New York City schools for the 2008-09 school year was April 13-17, 2009, sixty school days could not have elapsed before June 30, 2009, the end of the 2008-09 school year.

to obtain an autism evaluation where the district had reason to know that the child had autism. *Id.* at 1209. Instead, the district merely referred the child's parents to the Missoula Child Development Center, which could perform an autism evaluation. *Id.* Such action failed to satisfy the IDEA's mandate that districts "ensure that the child is assessed." *Id.* In this case, however, the CSE had the evaluations of Drs. Auricchio and Angelosante, and cannot be faulted based on *N.B.* for relying on these private evaluations instead of conducting its own. Therefore, the Court finds no procedural reason to reverse the SRO Decision.[5]

### B. Substantive Issues

The substantive inquiry in which courts must engage in IDEA cases reviewing state administrative proceedings is whether the IEP is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. "[F]or an IEP to be reasonably calculated to enable the child to receive educational benefits, it must be likely to produce progress, not regression." *D.F. ex rel. N.F. v. Ramapo Central School Dist.*, 430 F.3d 595, 598 (2d Cir. 2005). A district court "must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan." *Walczak*, 142 F.3d at 130 (internal quotation marks omitted). "A valid IEP should provide for the opportunity for more than trivial advancement, such that the door of public education is opened for a disabled child in a meaningful way." *Id.* (internal quotation marks and citation omitted). There is no requirement, however, that an IEP be "sufficient to maximize each child's potential," *Rowley*, 458 U.S. at 198, and the guarantee of an "appropriate" education does not also guarantee one

---

[5] Plaintiffs argue in their reply brief that the DOE failed to fulfill its "child find" obligations. (*See* Pl.'s Reply 1-3.) This argument, however, is waived, as it was not raised at any of the administrative hearings, in the complaint in this action, or in plaintiffs' opening brief. *See A.D. v. Board of Educ. of the City of New York*, 690 F. Supp. 2d 193, 214 n.16 (S.D.N.Y. 2010) ("This argument was not raised in the administrative proceedings below and therefore is waived."); *Bruschini v. Board of Educ.*, 911 F. Supp. 104, 107-08 (S.D.N.Y. 1995) ("The failure to present claims of procedural errors in connection with approval of individualized education program (IEP) at the administrative hearings bars such claims from being heard by the district court."). The same is true with respect to plaintiffs' argument that the IEP does not contain "transition services." (Pl.'s Reply at 7.)

"that provides everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132.

The IDEA also includes a statutory preference for the "least restrictive environment," and instructs state education officials that "[t]o the maximum extent appropriate, children with disabilities," are to be "educated with children who are not disabled."  20 U.S.C. § 1412(a)(5)(A).  "[S]pecial classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.*

As discussed above, the SRO Decision found that the IEP was reasonably calculated to enable H.H. to receive educational benefits in the least restrictive environment.  The SRO found that the CSE had appropriately identified H.H.'s educational, social, and emotional needs, and had devised strategies, goals, and services that were directed toward improving the identified needs.  On appeal, plaintiffs nevertheless contend that the SRO Decision was erroneous for several reasons.

First, plaintiffs argue that the IEP had no counseling mandate because the "Related Services section of the IEP is blank" and was therefore inappropriate.  (Pl.'s Reply at 3-4.)  The SRO found that the CSE recommended counseling services of two 40-minute individual sessions per week.  (SRO Decision at 16.)  Plaintiffs acknowledge that "counseling is discussed in other areas of the IEP," but nevertheless contend that the failure to put the counseling and the amount being offered into the "Related Services" section of the IEP compels a conclusion that the IEP did not offer a FAPE.  (Pl.'s Reply at 4.)  The DOE reiterates that counseling is discussed in other areas of the IEP, and further points out that the both the IHO and plaintiffs implicitly

acknowledged that "there was no dispute as to the level of counseling services recommended by the CSE" by their conduct.  (DOE Reply at 4; *see also* DOE Mem. at 18 n.5)  Thus, the DOE contends that the omission of the duration and frequency of counseling was "harmless error" and did not constitute a denial of FAPE.  The Court agrees with the DOE.  In this case, it would "exalt form over substance" to hold that the IEP was inappropriate simply because a recommendation, omitted from the IEP because of a clerical error (*see* Tr. at 41)—but which appeared in the CSE meeting minutes, (DOE Ex. 4.), and was reflected in the conduct of the parties—failed to appear "within the four corners of the IEP."  *Doe v. Defendant I*, 898 F.2d 1186, 1190 (6th Cir. 1990); *see also Antignano v. Wantagh Union Free School Dist.*, 07 CV 2540, 2010 WL 55908, at \*5 n.5 (E.D.N.Y. Jan. 4, 2010) ("Although the testimony at the impartial hearing was that the CSE recommended daily supportive reading in a 2:1 setting, the IEP, in fact, only refers to 'daily supportive reading.' However, it is clear that all parties understood the recommendation was for a 2:1 setting and therefore the omission was harmless." (internal citation omitted)).  The one case cited by plaintiffs, *Sytsema v. Academy School Dist. No. 20*, No. 03-cv-2582 (RPM), 2009 WL 3682221 (D. Colo. Oct. 30, 2009), is distinguishable. There, unlike here, "the District acknowledged that the services described in the written IEP were not adequate to meet [the child's] needs."  *Id.* at \*5.  In addition, the district in that case could not "clearly describe the services proposed in the written IEP" even during the district court's review.  *Id.*  The written IEP in *Sytsema*, therefore, had acknowledged deficiencies and equivocations in its intended recommendations that explain the court's reluctance to consider information outside of the written IEP.  These circumstances do not exist in this case, and the Court finds the DOE's argument persuasive on this point.

Second, plaintiffs argue that the amount of counseling recommended is insufficient. Plaintiffs cite no authority on this point, but instead compare the amount of counseling recommended to that which H.H. receives at RLS.[6]  (Pl.'s Reply at 5.)  But comparing the amount of counseling H.H. receives at RLS to that recommended in the IEP does not demonstrate whether or not the IEP's recommendation was appropriate.[7]  By that rationale, even if the IEP had recommended exactly the amount of counseling H.H. receives at RLS, the IEP would nevertheless be inappropriate if the Parents had chosen some other private school that offered even more counseling.  The Court therefore finds that "the appropriateness of a public school placement shall not be determined by comparison with a private school placement preferred by the parent."  *M.B. v. Arlington Central School Dist.*, No. 99 Civ. 9973(SAS), 2002 WL 389151, at *9 (S.D.N.Y. Mar. 12, 2002).

Third, plaintiffs contend that the SRO erred in finding the IEP appropriate because "the CSE did not recommend that H.H. work with a learning disorder specialist as was recommended by Dr. Auricchio."  (Pl.'s Mem. at 15.)  But, as the SRO noted, although a CSE is required to consider reports from private experts, it is not required to follow all of their recommendations. (*See* SRO Decision at 19); *Watson ex rel. Watson v. Kingston City School Dist.*, 325 F. Supp. 2d 141, 145 (N.D.N.Y. 2004) (noting that "[t]he mere fact that a separately hired expert has recommended different programming does nothing to change" the court's reluctance to disturb

---

[6] Plaintiffs also compare the amount of counseling recommended in the 2009-10 IEP to that recommended in H.H.'s 2010-11 IEP, but the Court finds persuasive the line of cases that have "held that inquiry into whether an IEP is valid is a necessarily *prospective* analysis" and notes the Second Circuit's suggestion that "an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated."  *D.F.*, 430 F.3d at 598-99 & n.2 (collecting cases).  Under that rationale, an IEP postdating the one at issue in this case is of little probative value for evaluating "appropriateness" in this case.

[7] It should be noted that the DOE also disputes the validity of this comparison because of the difference between the one-on-one counseling noted in the IEP and the type of advising and counseling H.H. receives at RLS.  (*See* DOE Reply at 5 n.1).  To the extent that plaintiffs intend to assert that group counseling at RLS is a superior method of educational counseling than "crew" at Baldwin, the Court finds that this sort of inquiry is the exact sort of educational policy on which it is appropriate to defer to the SRO, who credited Baldwin's "crew" approach.  (*See* SRO Decision at 16-17.)

the SRO's findings).  Moreover, the SRO conducted a detailed review of the CSE's assessment of H.H.'s needs and concluded that adopting Dr. Auricchio's recommended testing accommodations adequately addressed H.H.'s test anxiety and slow visual processing.  (*See* SRO Decision at 15-16.)  Without more, the difference of opinion expressed by the private expert is not sufficient to overcome the deference properly accorded to the SRO's careful analysis of the record.

Fourth, plaintiffs argue that H.H. was improperly classified as "Other Health Impaired" instead of "Emotional Disturbance."  (Pl.'s Mem. at 16.)  But the law is clear that school districts are not required to classify a student in a particular category.  Rather, as the DOE correctly points out, "the only relevant question is whether the Student was offered FAPE."  (DOE Mem. at 21); *see* 20 U.S.C. § 1412(a)(3)(B) ("Nothing in this chapter requires that children be classified by their disability so long as each child who has a disability . . . is regarded as a child with a disability under this subchapter."); *Heather S. v. Wisconsin*, 125 F.3d 1045, 1055 (7th Cir. 1997) ("The IDEA concerns itself not with labels, but with whether a student is receiving a free and appropriate education.").  The case plaintiffs cite, *Muller ex rel. Muller v. Committee on Special Education*, 145 F.3d 95, 103 (2d Cir. 1998), deals with whether the plaintiff is being classified as entitled to special education services at all under the IDEA, an issue that is not in dispute in this case.

Fifth, plaintiffs argue that the IEP "does not even mention H.H.'s history of school refusal."  (Pl.'s Reply at 7.)  That contention is factually incorrect, as the IEP does note that H.H. "is emerging from a long period of school withdrawal."  (Parents Ex. C at 4.)

Finally, plaintiffs argue that the SRO erred in finding the class size at Baldwin to be appropriate.  (Pl.'s Mem. at 11-15; Pl.'s Reply at 5-7.)  The SRO found that the IHO erred by

determining that the IEP was inappropriate because of its class size.  In so finding, the SRO

specifically acknowledged Dr. Stilman's testimony before the IHO that she thought H.H. would

feel overwhelmed in a class of twenty-five students, but discounted that testimony because Dr.

Stilman also testified that she was unfamiliar with the level of support offered at Baldwin.  (SRO

Decision at 18.)  The SRO further noted that neither the Dr. Auricchio's nor Dr. Angelosante's

evaluation recommended a small class size for H.H., and that the hearing record was devoid of

evidence that H.H.'s anxieties or perfectionism were affected by class size or evidence that H.H.

would be unable to function in a class of twenty-five students.  (*Id.* at 18-19.)  Plaintiffs argue

that the lack of a class size recommendation in Dr. Angelosante's evaluation should be

discounted because that evaluation did not offer any educational recommendations.  (Pl.'s Reply

at 7.)  In this respect, plaintiffs are probably correct.  But the remainder of plaintiffs' arguments

are dedicated to convincing the Court that it should differ from the educational policy judgment

the SRO made with respect to the appropriateness of Baldwin's class size.  For example, plaintiff

recounts at length H.H.'s psychological history and asserts then that the "vast majority of

evidence supports the conclusion that H.H. . . . requires a small class size."  (*See* Pl.'s Mem. at

10-13.)  The connection between that history and what class size is appropriate for a student with

that history, however, is exactly the sort of policy judgment on which the Second Circuit has

instructed that this Court should defer to the SRO, especially where, as here, the SRO's "review

has been thorough and careful."  *Walczak*, 142 F.3d at 129; *Watson*, 325 F. Supp. 2d at 145

(noting that "class size" is among the "questions of methodology more appropriately answered

by the state and district decision-makers").  The Court, therefore, affirms the SRO's decision as

to the appropriateness of the IEP.  Having so affirmed, it is unnecessary to consider the

arguments relating to whether RLS constitutes an appropriate placement and whether the equities favor reimbursement.

## CONCLUSION

For the foregoing reasons, the DOE's motion for summary judgment [12] is GRANTED.

Plaintiff's motion for summary judgment [8] is DENIED. The Clerk of the Court is requested to

close this case.


SO ORDERED.

Dated: New York, New York
      February **16** , 2011

                                        Richard J. Holwell
                                  United States District Judge